Good morning, Your Honors. May it please the Court. My name is Morgan Russell. For the petitioner, Balwinder Singh. This petition challenges the agency's adverse credibility finding. And I'll just walk through the three bases that the immigration judge gave for his adverse credibility finding in the original decision below. First, the immigration judge asserted that it was implausible that Mr. Singh would have reported his first incident of persecution to Indian police, but that he would not have told party leaders in his party about the attacks that he suffered. All of the immigration judge's purported evidentiary bases for this assertion are not supported, leaving this suggestion to be merely the immigration judge's speculation that someone in the petitioner's position would have told others in his party about the attack. And your position is that it would have been reasonable because he did not know these two individuals? It would have been reasonable that he did not tell them? Right. So the immigration judge tried to support this implausibility assertion by first saying that, well, of course he would have told the district party leader, Mr. Kashmiri, because he knew Mr. Kashmiri personally, and Mr. Kashmiri was in touch with him with some quote with some regularity about his duties for the party. In fact, there was no personal relationship. Mr. Singh testified that Mr. Kashmiri and he didn't know each other face to face. He saw him at rallies. He got five telephone calls to put up posters, didn't he, from Kashmiri? His testimony was that he got two to three phone calls over the 14 months that he was in the party. I don't think that supports the IJ's assertion on which his implausibility suggestion is based, that they were in touch with some regularity. I think two or three times over 14 months. I don't think that's a fair way to characterize that. The IJ then also said that Mr. Singh gave no cogent reason why he would report it to police, but not to his party members. In fact, he testified that when he first went and reported it to the police, his hope was that they would arrest the Congress party workers who had attacked him, and that this show of support for his party and against the other party by police and authority would earn respect for his party. That, of course, wasn't successful. The police refused to take the report because of the power of the Congress party. I don't think there's anything implausible. So I think that just sort of, you know, he did give a cogent reason why he would tell the police. Did he give a cogent reason why he did not tell the party district manager, Mr. Kashmiri, with whom we talked on the telephone on several occasions? Yeah. Well, he said that he didn't want a lot of people to find out because he didn't want to bring negative attention to his party and discourage other people from joining. Not quite. He said that it would upset the balance of the party. Now, tell me what he meant by balance. I can't tell you what he meant by that. No, neither could anybody else. Right. But the ambiguity of the English phrase that the interpreter used in court was not the basis of the IJ's decision. Were there problems with translation? There are some points when I was going through the record. I noticed some points where, you know, there's things that in the transcript where there's sort of strange uses of phrasing and things. That's not a basis for, you know, a basis for my argument for reversal here. It seems like the translation, as is often the case, could have been better. You know, what he meant by the balance of the party, I'm not entirely sure. But he did elsewhere say, you know, specifically refer to didn't want to distract people who had an intention of joining the party. And I think that makes pretty clear that he didn't want to dissuade people from joining. And I think that that's an understandable reason. The IJ also, you know, tried to support this notion that it's implausible. He wouldn't tell his party leadership by saying that, well, other people found out. Other people in his village found out. The Sarpanch, the head of the village council, found out. And so it's not as if no one else found out. So why wouldn't he tell the party leadership? I just don't think that's supported by the record as a basis for the IJ's assertion because, as explained in our brief, you know, someone who actually did know him and his family well found out about the attack from his family, came to visit him, and they spoke about it. The fact that other people in his small village found out through his family doesn't even – and, you know, he didn't tell the Sarpanch. He didn't tell other people in his village, but they found out through his family. It was something that had happened to someone in the village. And I don't think that's any basis to doubt that he wouldn't have told people in the party for the reasons he gave. So I think that absent – So you're arguing that it's quite rational for him to tell the police, to tell the Sarpanch, and tell other people in the community. That doesn't scare anybody off from joining the party. But if he tells the party, that scares people off? Well, he didn't tell the Sarpanch, and he didn't tell other people in the village. Those people found out through his family. That was his testimony. And those are the reasons that I.J. gave, and those reasons that I.J. gave are all not supported. So the I.J.'s then inference that it's implausible, I think, also has to fall away, absent any support in the record for those supporting bases for it. The next thing that I.J. said was that – pointed to this lack of references in the letters from the party's sort of head president for all of India and from that same local district leader, that they didn't refer – he filed to Mr. Singh for those letters not referring to his instance of past persecution. But as we just discussed, they didn't hear about those things from Mr. Singh himself. They didn't have any personal – No, they heard about it from his parents, who said because he's been beaten twice, we'd like you to write these letters. So they wrote the letters, but they didn't mention the beatings. Isn't that suspicious? Well, that's with respect to the – sorry, Your Honor. Didn't mean to interrupt. Go ahead. Just don't bother interrupting me. Go ahead. That's with respect to the – the testimony that his parents requested specifically is from the sort of head president of the party. That letter from the head of the party, you know, I think is very clearly a sort of form letter that mentions his involvement and then goes on and gives a lot of background information. But, you know, I don't think there's any reason to – to expect that someone at that much higher level of authority would, you know, have a basis or go into the details of – of the past persecution incidents, which would just be sort of hearsay from the parents or something anyway. But the reason that the letter is being sought is because Mr. Singh claims that he was beaten twice and would be persecuted if he went back. I don't – I don't think that's right. And there's actually a good – I can – I can file a 28-J on this, but there's a good Second Circuit case that I think makes a good point about this kind of situation. It's GAO-GAO v. Sessions, 891 F. 3rd, 67 at 81, Second Circuit from this year. And there the – I.J. had faulted a – an applicant for the fact that a letter from his pastor that sort of certified that he had been baptized as a member of a particular church didn't refer to an incident of an arrest, a past persecution in that letter, sort of talking about his membership in the church. I think here it's the same situation. These letters are – what they speak to is his membership in the party and his support for this political cause. Neither of these party – and that's certainly an element, a part of his claim, you know, that it corroborates that part of his – of his claim that he was a member of this party. Neither of these, you know, higher-level party leaders had any kind of direct or even secondary, secondhand knowledge of the attacks themselves, and so there's no reason to expect that they would be able to speak to that or would speak to that. Do you want to address the contradictions regarding his voting? Right. So as to the voting – as to the voting card, you know, again, as explained in the briefs, I don't think that there's a real inconsistency here between, you know, at first he says – there's this sort of odd question, was there a reason you didn't have a card? He says no. Later on it gets into a much bigger discussion about why he didn't. First he says he didn't need a card to vote in 2004 and 2005. Then he says he needed a card and he couldn't vote, and the Congress Party workers wouldn't give him a card. So I don't think there's an inconsistency as to that either. He first says they didn't ask for my card. I was able to vote in 2004, 2005 because they didn't ask for my card. I think that's not inconsistent. He never said that you never needed a card. There was never a policy. He said he voted without a card. I think it's a – but I think it's a difference between – you know, he never said there was a policy you don't need a card, and that's why I was able to vote, and then there was a policy that you did need a card and that's why I wasn't. His testimony was that throughout the period, including in 2004 and 2005, in that election, you needed a card, but he wasn't asked for his, i.e., that policy wasn't enforced then. And later, other times, he was not able to vote when he didn't have a card. Are you saying the I.J. misstated his testimony? Yeah, I think misstated his testimony. I don't think it's a fair reading of his testimony to say that he said you don't need a card, like one doesn't need a card. One didn't need a card in 2004 or 2005 as a matter of policy. He never said that. Apparently, sometimes they ask for your card and sometimes they don't. Right. So it seemed as a matter of enforcement, that policy wasn't enforced against him, and he – that's what his testimony was. They didn't ask for it. He never said that, you know, that you didn't need a card. That sort of one didn't need a card at that time. And my time is up. Thank you. Thank you. May it please the Court. Victor Lawrence on behalf of the Attorney General. This Court should deny this petition for review as the adverse credibility finding was properly rendered using the totality of the circumstances, and it was supported by specific and cogent reasons. My opponent suggested some areas where he didn't believe that the record fully supported the finding. But that's not his burden. The burden is to show that the record compels an adjudicator to come to a different conclusion than the immigration judge or the board. And we submit that the Petitioner has not done that here. And in addition, we believe that all three of these factors were supported by substantial evidence. And I, too, will address them, I guess, in the same order as — Mr. Lawrence, where is the evidence that somebody who is a party worker would, in a routine, normal manner, report a beating to the party rather than just the police? The evidence is in the fact that this Petitioner has the burden of proof to prove that he's a refugee, to prove that he deserves asylum, that he deserves political asylum in this case. This is a case based on persecution as a result of his political opinions. So he has to submit evidence to the agency to show that the reason he was persecuted was because of his political opinions. The normal way to do that is to show evidence from his party that he was involved, but also that he was persecuted as a result of his involvement. Well, he was involved. There's no question about that. And he reported to the police that he was beaten. Where is the nexus or where is the major premise that all party workers report all beatings to other party workers? Well, we're not saying there's a major premise, but we're saying that this is a reason. It has to be. Otherwise, the — Well, this is a reason why the immigration judge found his story implausible, that he — that it's a natural thing, particularly when he went back to find more evidence. What's the basis for saying it's a natural thing? The basis is because it's a claim of political asylum based on persecution. No. Let's look at the adverse credibility determination here. Sure. I just — I'm trying to follow you, and it seems like you're conflating his burden to show his — what he needs to show at this proceeding to get asylum or withholding and cancellation versus what we — how we analyze an adverse credibility determination. When we look at an adverse credibility determination, we have to determine whether or not that I.J.'s basis was supported by substantial evidence. Do you agree with that? Yes, that is the standard. That's the question that we're looking at right now with respect to Mr. Singh's testimony and his personal relationships that he allegedly had with Mr. Kashmiri, the local man president. It seems that the I.J. may have mischaracterized that testimony because Mr. Singh seems that — he testified he had no relationship with Mr. Kashmiri, and if Mr. Singh did not know Mr. Kashmiri personally, why isn't it plausible that he would not tell him about the attacks? And I think that's what Judge Bea is asking. What — so then, where is the proof that he would have told him about the attacks? Because, you know, two or three times over a period of 14 months, I don't think, develops a personal relationship like the I.J. characterized. Well, I think, you know, at page 210 of the record, there's an indication that there was a recess where the parties discussed what would happen between the September 4th hearing and the next hearing, and he said that he was going to get some additional evidence from Mr. Kashmiri, implying that there was a personal relationship, or at least to ask for that. As Judge Bea pointed out also — Well, I'm looking at AR-145. Singh never mentioned Mr. Kashmiri and did not know him. The question was, did Harbhajan Singh Kashmiri know you? Answer, no. Question, and did — and how did he know you? A, not face-to-face. It looks like there were some translation issues. And then Mr. Singh testified that he never attended a party meeting and that Mr. — that he didn't have a — I mean, what I'm taking is that he didn't have a personal relationship with him, that he'd gotten — somebody had given Mr. Kashmiri the phone number for Mr. Singh from party records. Right. So there was no testimony, and the IJ never said that he had a personal relationship with him. I don't believe he used those words. Well, but that's — he's — I'm trying to figure out why he then would say that there isn't — why Mr. Singh was lying or not credible in saying that he didn't report it to Mr. Kashmiri. Well, because I think you have to look at, in the context of everything, where he knows that the — the IJ knows that this was known by the Sarpanch of the city, it was known by the police, but — and then also to consider the reason why he gave about that it would cause an uproar to the balance of his party. These are all — Well, but it doesn't make sense to me. I'm just — I'm trying to understand, because then later the IJ says, well, he's faulting Mr. Singh for — for saying that his — the evidence that he submitted don't corroborate each other. I think when Mr. Kashmiri and Mann later submitted letters in support of Singh's application for asylum, they did not mention the attacks. And so I think that's when the IJ faulted him. And I'm just trying to figure out how — why would Kashmiri and Mann talk about the attacks if they didn't know about them? And how do these two consistent pieces of evidence support an adverse credibility determination? Well, as Judge Bea pointed out, and as the record reflects, his parents went to talk to these individuals about needing additional evidence for their son's asylum hearing and told them about the fact that he was beat by the Congress party workers. So it — if I were in the position of a judge, I would be confused why he's submitting this additional evidence from these people who were told by his parents that he was beat, and there's absolutely no mention or reference to it. I grant you the fact that these individuals, these party leaders, did not have personal knowledge of it, but they were informed of it by his parents, yet decided or wrote these letters, found it, the record in page 307 and 839 to 848, which made absolutely no reference of the fact that he was persecuted. And remember, this claim is based on persecution. I know, but I'm having trouble. I don't understand why that's an adverse credibility finding for Mr. Singh. How is that an adverse credibility finding for him? Because he's — It's a relevant omission of facts. It's a glaring omission that he's — But that's not what the I.J. said. That's what you're saying. No, he called it an omission. The I.J. called it an omission. If you look at page 54, right in the middle of the page — But I'm saying he didn't say it was a glaring omission because of what the parents said, did he? No. But to answer your question, but he said, at page 54, the I.J. said, under the Real ID Act, the Court may base an adverse credibility determination on any relevant factor considered in light of the totality of the circumstances can reasonably be said to have a bearing on Petitioner's veracity. And he said, in this case, the fact that supporting documents from the party members omit mention of the respondents' injuries undercuts his credibility. Doesn't that get back to the same issue that he did not really know the party members who apparently were unaware of it, and the folks that he did know, they were aware of it, and they're the ones that he told? Isn't that where Mr. Singh's argument is? It's not inconsistent that the party members would not mention it because he did not know them personally. But how do you square that, Your Honor, if I don't mean to ask a question back at you, but how do you square that with the fact that his parents went to these leaders and said, we need letters for our son who's requesting political asylum? But that's not what the I.J. said about the parents. That's not what the I.J. says. Oh, I find this odd because the parents have what the parents have submitted. No, no. If I may show you, Your Honor, on page 54, in the third paragraph, it says, despite his parents' personal appeal to Mr. Mann, the letter contains no specific information about the Respondent besides his name and address. It does not mention either attack. So, yes, indeed, the immigration judge does point out the fact that there was a personal appeal to Mr. Mann and that he didn't mention either attack. And he doesn't provide a substantial reason why his parents had appealed to the President for help and yet neglected to ask Mr. Kashmiri, with whom he had, yes, he does call it a personal relationship, but he had a relationship that's borne out by the record that he's been in contact with him a few times. I just have a few seconds left, but I'd like to also point out why the notice, the voter registration card, is also key here because it's an inconsistency as well. And remember, under the Real ID Act, as long as there's one inconsistency that's supported by the record that the Court finds, whether it's any of these three facts under Jiang, then the Court should uphold the substantial – uphold the adverse credibility determination based on substantial evidence. And here, at page 130 of the record, Respondent – or, excuse me, the Petitioner clearly said that there was no reason he didn't have a card. No reason, but he was able to vote anyway. Then later, at page 135 and 141 to 142, he changes that and he says the government representatives did not want him to have a card. And then when he asked what – the immigration judge said, why are you – how do you square these two statements, he just said it was a mistake. Now, the judge – the immigration judge doesn't have to find that to be a persuasive response, that he says I made a mistake. The immigration judge can reasonably determine, based on that, that that was an inconsistency that – and when asked about it, he provided an unpersuasive explanation. Thank you. We've taken you past your time. Thank you very much. We ask that you deny the petition for review. You get a minute of rebuttal. Thank you. What's your response to the parents' appeal, despite the parents' appeal, there was no reference to Mr. Mann's? Right. And I was going to point out that passage, if my colleague didn't get to it, that it does make that reference in the IJ's decision. But I think the IJ, in that same sentence, mischaracterizes the letter in a different way. It says the letter contains no specific information about Mr. Singh besides his name and address. But that's not true. The first page of the letter, you know, the letter asks – says that he's a member of the party, asks that he be granted protection, asylum in the United States, because he's in danger in India. It's true that it does not mention either attack. It doesn't go into that level of detail. But it's not true that it only gives his name and address. It does sort of, you know, it does refer to the basis of his claim. That letter in particular – so first of all, there's no – there's no testimony or evidence that his parents made any kind of similar appeal to Mr. Kashmiri. So we don't know that. So I think that the suggestion as to that other letter is there's no basis for it. And I do think that I.J. mischaracterized the nature of the party, the head party president's letter, Mr. Mann. As to – and then just very briefly as to our argument that even if – you know, I think it seems pretty clear to me that the implausibility ground and the corroboration ground as the letters aren't supported, I think, you know, perhaps the closest would be the voter issue. I don't think that there's an inconsistency – a real inconsistency between, you know, his, you know, saying no at first and then later speculating as to something that he couldn't possibly have known about. But even if the Court, you know – and I think importantly that I.J. sort of acknowledged that that was a minor inconsistency. The Court rather – the government cites to this Court's decision in Jiang for the uphold the adverse credibility finding. But in Jiang, they cite for that proposition to this Court's decision in Risk, which is a pre-real ID case in which an inconsistency had to go to the heart of the claim. I think under – and so I think – and in Jiang, as we described in the reply brief, it really was that kind of really core inconsistency. This Court in at least a recent unpublished decision has remanded for further consideration under the totality where one basis of the I.J.'s decision they found supported. That's an unpublished decision from last year. Also captioned, Balwinder Singh v. Sessions, a different Balwinder Singh. It's 719 Federal Appendix 595. And I can also cite that in a – I'm taking the best of your time. Thank you very much, Mr. Ramos. Thanks, Your Honor. The case of Balwinder Singh v. Sessions will be submitted.
judges: Bea, Murguia, Soto